ZOLTEK CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant,

and

Lockheed Martin Corporation, Third–Party Defendant.

No. 96–166 C.

United States Court of Federal Claims.

Filed: May 4, 2012.

Released for Publication: May 21, 2012.[1]

**1.** This opinion originally was issued under seal on May 4, 2012, pending a determination among the parties whether to propose redactions of privileged, competition-sensitive, proprietary, confidential, or otherwise protected information. The parties did not propose any redactions, and therefore, the Court is releasing the opinion in full.

Dean A. Monco, Wood, Phillips, Katz, Clark, & Mortimer, Chicago, IL, for Plaintiff.

Gary L. Hausken, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant, with whom was David M. Ruddy, Of Counsel.

Scott F. Roybal, Sheppard, Mullin, Richter & Hampton LLP, Los Angeles, CA, for nonparty Northrop Grumman Corp., with whom was Joseph F. Coyne, Jr., Of Counsel.

Richard Thomas Ruzich, Duane Morris LLP, Chicago, IL, for Third–Party Defendant.

## OPINION & ORDER

DAMICH, Judge:

In this patent infringement suit Plaintiff Zoltek Corporation claims that the B–2 Bomber Aircraft contains components that infringe U.S. Reissue Patent No. 34,162 ("the '162 patent" or "the Patent"), which covers a method for manufacturing carbon fiber sheet products that have controlled surface electrical resistance. Third party Northrop Grumman Corporation is the contractor primarily responsible for building the B–2 Bomber for the United States Air Force ("USAF"). Fact discovery in this case was scheduled to close on March 1, 2012. On January 30, 2012, Zoltek served Northrop with a subpoena seeking discovery of documents and seeking deposition testimony. Currently before the Court is Northrop's Motion to Quash Zoltek's January 30, 2012 subpoena. The motion was filed on February 21, 2012, and briefing on the motion was completed on March 12, 2012.

The present discovery dispute is the most recent of many such disputes that have arisen during the 16–year history of this case. Although this dispute nominally is about Northrop's motion to quash Zoltek's subpoena, the dispute implicates a substantial number of the Court's prior rulings on discovery. In its opposition to the motion, Zoltek appears to ask the Court to revisit its prior discovery rulings and to request that fact discovery be extended. In support of its argument, Zoltek essentially admits that its subpoena exceeds the bounds set by the Court's prior orders, but it argues that the expanded discovery must be permitted because the Government's invocation of the state secrets privilege has prevented it from obtaining discovery of certain information relating to the B–2. Zoltek also asserts that newly discovered information shows that Northrop has failed to produce documents and that the time for discovery should be enlarged. For the reasons that follow, the Court grants-in-part Northrop's Motion to Quash and denies Zoltek's request to expand and extend discovery.

## I. BACKGROUND

### A. The Present Discovery Dispute

The present dispute started shortly after the Court issued its August 30, 2011 discovery order (the "Discovery Order"). The Discovery Order ruled upon Zoltek's March 2011 motion for additional discovery. In its motion, Zoltek sought, *inter alia,* to take several depositions, to obtain document discovery relating to liability and accounting, and to retest samples of components of the B–2.[2] In seeking the additional discovery, Zoltek explained that it was not seeking to reopen every aspect of discovery, but only discovery in "those specific areas identified in its [motion and briefs] that it would have pursued had it not been limited by the Court [in 2007] to respond to the Summary Judgment Motion." Pl.'s Reply, Apr. 8, 2011, at 1 (Docket No. 420). The Government had argued that fact discovery was closed, and therefore Zoltek was not entitled to additional discovery absent a showing of good cause. The Government also asserted that discovery of ac-

---

**2.** Zoltek also requested permission to obtain security clearances so they could obtain greater discovery. After holding a status conference with the parties, the Court found that Zoltek's counsel would not gain any additional discovery by obtaining security clearances because any classified information would be within the scope of the state secrets privilege. Therefore, this request was denied.

counting information was premature because this case had been bifurcated into two phases: liability and damages.

The Court found that fact discovery was not closed and it permitted Zoltek to seek additional discovery on several limited classes of information. In granting the request, the Court noted that Zoltek had changed counsel in November 2009, and that Zoltek's request related to the approach and actions taken by prior counsel. The Court stated that it "sympathizes with the Plaintiff and the Plaintiff's current counsel ... who may have a different approach to discovery than prior counsel." Order, Aug. 30, 2011, at 9 (Docket No. 421).

The Court's Discovery Order granted Zoltek permission, in relevant part, to: (1) take depositions of two Northrop employees, George Rodgers and Michael Capoccia, (2) attempt to obtain documents from Northrop that Zoltek had specified in a "Wish List" dated October 5, 2005, (3) depose USAF engineer Michael Urig, (4) depose Louise Hefner, an employee of Northrop's supplier, BASF Corp., and (5) retest samples of B-2 components previously provided by the Government. However, Zoltek was prohibited from seeking discovery of information that related to accounting and that was covered by the state secrets privilege. Accordingly, the Court precluded any requests for information that went to the use of carbon fibers on the B-2 and to accounting issues.[3]

Although not explicitly stated in the Discovery Order, discovery still was limited by the Court's prior discovery orders. As relevant here, the Court had limited discovery to: (a) the B-2 program because Zoltek lacked sufficient support to make a plausible claim against any other weapons program,[4] (b) liability/infringement issues because in 1997 this case was bifurcated into liability and accounting, and (c) non-classified information because the Government invoked the state secrets privilege as to certain categories of information. In an order issued on September 9, 2011, the Court scheduled the close of fact discovery for March 1, 2012.

On October 6, 2011, Zoltek switched counsel and retained its original attorney, Dean Monco. On October 17, 2011, Zoltek issued subpoenas to the Government and Northrop.[5] In November 2011, both Northrop and the Government filed motions to quash the subpoenas. The Court conducted several status conferences with the relevant parties. The Court stated that the fastest way to proceed would be to have Zoltek respond to the motions to quash and the Court would rule on them. Status Conf. Tr., Nov. 9, 2011, at 19 (Docket No. 424). The Court stated, however, that it would not suspend the discovery deadlines while the motions were pending. *Id.* Nonetheless, Zoltek requested an enlargement of the discovery deadlines, in part, to make up for the time lost by the change in counsel. The Court stated that it would grant the enlargement only if the parties could informally resolve their dispute over the subpoenas. Zoltek opted against filing a response and tried to informally resolve the dispute. Zoltek and the Government resolved their differences as to the subpoena directed to the Government, but not to the subpoena for Northrop. In an effort to limit their differences, Zoltek deposed Messrs. Rodgers and Capoccia in January 2012.

Finally reaching an impasse, on January 30, 2012, Zoltek issued another subpoena to Northrop which contained most of the re-

---

**3.** The Court precluded discovery of information on the use of carbon fiber products on the B-2 for two reasons. First, how the USAF uses fibers with controlled electrical properties is protected by the Government's assertion of the state secrets privilege. Second, how the fibers were used on the B-2 is not necessary to prove infringement of a patent on a method for manufacturing the fibers. Zoltek appeared to recognize as much as it had asserted that the use of the fibers was relevant to the issue of damages.

**4.** Zoltek also has asserted a claim that another weapon system, the F-22 Fighter Plane, infringes

the Patent. Because the issues relating to the B-2 and the F-22 are legally and factually distinct, the parties agreed in 2004 that the F-22 claim would proceed independently from the B-2 claim. Status Conf. Tr., Feb. 5, 2004, at 7 (Docket No. unavailable) (Zoltek stating that the B-2 and F-22 were "two separate and distinct infringements"); *id.* at 13 (Government stating that the B-2 claim should go forward independently of the F-22 claim).

**5.** The two subpoenas contained nearly identical requests.

quests from its October 2011 subpoena plus several new requests. Northrop filed the Motion to Quash Zoltek's subpoena, and the Government has filed a brief in support. Both the Government and Northrop maintain that Zoltek's subpoena exceeds the bounds of authorized discovery because it is not limited to the B–2, it seeks accounting information, and it seeks privileged information. *See* Northrop's Mot. Quash, Feb. 21, 2012 (Docket No. 443); Def.'s Br. Mot. Quash, Feb. 21, 2012 (Docket No. 444). On February 28, 2012, Zoltek filed a Response in Opposition to the Motion to Quash. Zoltek asserts that the motion to quash should be denied because, even though its subpoena may exceed the authorized scope of discovery, the state secrets privilege has prevented Zoltek from obtaining certain information and therefore the expansion of discovery is warranted. Pl.'s Resp., Feb. 28, 2012 (Docket No. 445). Zoltek also appears to move to compel the production of the documents requested in its subpoena and to ask that Northrop be held in contempt for failing to produce documents in 2004 and 2005. *Id.* at 9–10.

In its opposition, Zoltek also alleges that discovery should not close and the Court should enlarge the scope of and time for discovery due to "new" information that was disclosed in a February 16, 2012 deposition of Michael Urig. *Id.* at 3–8. In 1998, Mr. Urig had helped the Government amend its responses to Zoltek's First Set of Interrogatories. Mr. Urig reviewed the specifications of all the parts of the B–2 to determine whether the B–2 contained any carbon fiber components described in Zoltek's interrogatories, and he determined that it did not. Zoltek asserts that Mr. Urig's recent deposition testimony establishes that his methodology was flawed and that he did not consider several components, leading Mr. Urig to reach an incorrect conclusion. According to Zoltek, for the past 14 years, Mr. Urig's incorrect conclusions have prevented Zoltek from obtaining the discovery to which it feels it is entitled. The Court requested Northrop's and the Government's views on Zoltek's contentions regarding Mr. Urig, and on March 12, 2012, each filed a reply. Both Northrop and the Government assert that Zoltek has possessed the documents containing the allegedly new information for over 10 years and the information is not grounds for reopening discovery. Northrop's Reply, Mar. 12, 2012 (Docket No. 448); Def.'s Reply, Mar. 12, 2012 (Docket No. 447).

## B. Relevant Case History

To understand this disagreement, it is necessary to review some of this case's history because Mr. Urig's analysis, the scope of Zoltek's claim, and the state secrets privilege all have been the subjects of recurring disputes. Additional details about the history of discovery and related issues are set out in several prior opinions and orders. *See, e.g., Zoltek Corp. v. United States,* 61 Fed.Cl. 12 (2004); Order, Oct. 24, 2006 (Docket No. 336); Opinion, Feb. 13, 2009 (Docket No. 373); *Zoltek Corp. v. United States,* 86 Fed. Cl. 738 (2009); Order, Aug. 30, 2011 (Docket No. 421).

Zoltek filed this suit on March 25, 1996. The case was reassigned to this judge in 1999. Zoltek owns the '162 patent, which covers a method for manufacturing carbon fiber sheet products that have controlled surface electrical resistance. *Claim Construction Opinion,* 48 Fed.Cl. 290 (2000). The method of making the carbon fiber sheet products is comprised of two steps: (1) making "partially carbonized fibers" and then (2) combining the fibers together to form a sheet. *Id.* at 295. Partially carbonized fibers are made by heating a fiber starting material to a preselected temperature range "for the purpose of achieving a preselected volume electrical resistance corresponding to that required to provide the preselected desired surface resistance for the finished sheet product." *Id.* Zoltek alleges that the USAF infringes the '162 patent by causing the manufacture of carbon fiber sheet products pursuant to the patented method. Zoltek claims that the USAF has incorporated products made by the patented process into "various weapon systems including at least, among other weapons systems, the B–2 Bomber." Third Am. Compl. (Docket No. 372). The United States denies infringement and denies using on the B–2 Bomber sheet products made by the patented methods.

In August 1996, Zoltek served its First Set of Interrogatories. The Government's original response and its amended response (which was supported by Mr. Urig's analysis) have been an ongoing point of contention between the parties. In the interrogatories, Zoltek asked the Government, inter alia, (1) to "[i]dentify all U.S. weapons, weapon systems, items and objects employing carbon fiber technology," (2) to "[i]dentify all U.S. specifications and requirements for Stealth capability for each and every weapon, weapon system, item, or object purchased, used, or sold by the U.S. for the years 1984–present," and (3) to identify the three individuals who are "most knowledgeable regarding each weapon, weapon system, item, or object employing Stealth technology." Def.'s Reply, Mar. 1, 2012, Appx. at A1–A8 (Docket No. 447).

In the interrogatories, Zoltek defined several of the terms. The interpretation of these definitions has been at the root of much of the ongoing dispute. In "Section H," Zoltek defined "carbon fibers" to be "any carbon fibers having generally uniform, controlled electrical surface resistivity." *Id.* In "Section I," it defined "carbon fiber technology" and "carbon fiber products" as "any product, weapon, weapons system, object, or any other item having as part of its structure or composition carbon fibers having generally uniform controlled electrical surface resistivity." *Id.* And in "Section J," Zoltek defined "Stealth" and "Stealth technology" as "any weapon, weapon system, item, or object comprising in whole or in part carbon fibers or carbon fiber products as defined in Sections H and I, *supra,* so as to render the weapon, weapon system, item, or object, in whole or in part, radar absorbing for the purposes of avoiding detection." *Id.*

In October 1996, the Government responded that the only weapon system employing carbon fiber as defined was the B–2.[6] The Government listed Michael Urig as one of the three people most knowledgeable about the B–2. However, none of the persons listed as the three most knowledgeable people participated in preparing an answer to the interrogatories. In February 1998, Zoltek sent the

Government two letters in which Zoltek asserted that the Government's answers to the interrogatories were incomplete at best. Def.'s Reply, Mar. 12, 2012, Appx. A87–A92 (Docket No. 447). Consequently, the Government reevaluated the interrogatories with the help of Mr. Urig. On September 15, 1998, the Government served Zoltek with amended interrogatory answers and the Declaration of Michael Urig (the "Declaration"). The amended answers denied that the USAF had used carbon fiber technology as defined by Zoltek in any weapon system or other item, including the B–2.

In his Declaration, Mr. Urig described the methodology he used to determine whether any of the materials used in the B–2 were responsive to Zoltek's interrogatories. Urig Decl., at ¶ 4; *see* Pl.'s Resp., Feb. 28, 2012, Ex. 1 (Docket No. 445). He stated he read the patent and the interrogatories, Urig Decl., at ¶ 5, and where the interrogatory definitions were ambiguous, he assumed that the definitions were meant to limit the requests "to material of the type described in the patent: products having a desired electrical resistance which is controlled or determined by the pyrolysis of the fiber and not by addition of other materials." *Id.* at ¶ 10. He started by determining what carbon fiber materials were used in the aircraft, and then he eliminated the products which clearly did not meet the interrogatory definitions. *Id.* at ¶ 5.

He stated that he started with a master list of material specifications for products containing carbon fibers that were approved for use on the B–2. He created the list after reviewing the master catalog of material and process engineering specifications, and he verified the completeness of the list by comparing it to similar information he received from Northrop. *Id.* at ¶¶ 12–13. The list contained approximately 40 specifications. *Id.* at ¶ 13. Mr. Urig then eliminated from the list the products which did not meet the interrogatory definitions. He removed 19 specifications because the products were not used in the B–2. *Id.* at ¶ 14. He removed 7 specifications because they "described carbon fibers having a metallic coating that would

6. The Government later amended the response to include the F–22 as well.

make the surface resistivity of the fiber irrelevant. The surface resistivity of [those] materials is determined by the metallic coating, not by the pyrolysis of the fiber." *Id.* at ¶ 14. He then removed 10 specifications because the materials were used for structural purposes. *Id.* at ¶ 15. Of the 4 remaining specifications, Mr. Urig reviewed each complete specification to determine whether it called for a specific resistivity or range of resistivities. *Id.* at ¶ 16. None of the specifications called for such resistivity. Mr. Urig therefore concluded that none of the materials used on the B–2 were responsive to Zoltek's interrogatories.

Subsequently, Zoltek sought production of all documents relating to the use of carbon fiber materials on the B–2 bomber, as referred to in the Declaration. Def.'s Reply, Mar. 12, 2012, Appx. A114–A116 (Docket No. 447). In early 1999, the Government provided copies of the relevant documents and permitted Zoltek to inspect the master list of B–2 specifications at Tinker Air Force Base. In April 1999, the Government produced 898 pages of documents. *Id.* at Appx. A125–A126. The documents produced included Northrop Material Specification MS–419, which is one of the specifications that Zoltek currently asserts was not considered by Mr. Urig. Northrop stated that it had no additional documents to provide. Northrop's Statement re: Production of Documents, Aug. 25, 2004 (Docket No. 266); *see* Pl's Resp., Feb. 28, 2012, Ex. 8 (Docket No. 445).

On July 6, 1999, Zoltek filed its Second Motion to Compel, asking for an order compelling production of samples for testing of all the carbon fiber sheet products used on the B–2. Pl.'s Revised Memo. on Second Mot. Compel, July 9, 1999 (Docket No. 66). Zoltek explicitly requested a sample of MS–419. After the parties were unable to work out their differences, the Court held a hearing on the motion on March 16, 2001. During the hearing the Court and the parties extensively

discussed MS–419, and a revised version of that specification, MS–419B.[7] The Government asserted that it did not produce a sample of MS–419 because it did not contain carbon fiber technology as defined by Zoltek in the interrogatories. Hr'g Tr., Mar. 16, 2001, at 29–30 (Docket No. 155). Zoltek asserted that it was improper to exclude products that had a specified surface resistivity based on the Government's own assessment that the carbon fibers contained in the product did not have controlled electrical resistivity. *Id.* at 25–26; *see id.* at 11–14. The Government noted that Zoltek was objecting to the 1998 amended interrogatory responses, and that Zoltek had not taken the deposition of Mr. Urig or any other witness. *Id.* at 11–13. The Court granted the motion in part, and ordered the Government to provide Zoltek with "a sample of each and every type of carbon fiber sheet/mat used in any capacity on the B–2" and a sample of the product described by MS–419. Order, Mar. 16, 2001 (Docket No. 153). After the Government provided the samples in 2001, Zoltek had all of the specifications considered by Mr. Urig and had the opportunity to test samples of all the carbon fiber containing components of the B–2.

In 2001, Zoltek filed several subpoenas on Northrop, which it followed with motions to compel. Among other things, Zoltek was seeking "all documents and things relating to manufacture, purchase and/or use of partially carbonized fibers and sheets/mats/coatings containing partially carbonized fibers on any Government weapons system." *Zoltek Corp. v. United States*, 61 Fed.Cl. at 19. Zoltek made many similar requests for documents and information relating to the use of partially carbonized fibers in any weapon system. Northrop refused to fully comply with the subpoenas because it asserted that compliance would require disclosure of information

---

7. MS–419B is as an updated version of MS–419. *See* Northrop's Reply, Mar. 12, 2012, Appx. A259 (Docket No. 448). MS–419 is entitled "Surfacers, Carbon Fiber-Epoxy" and MS–419B is entitled "Surfacers, Carbon or Titanium Dioxide Filled." The specifications describe a carbon fiber product that is coated with a surfacer to achieve a specified surface resistivity. As relevant here, the main difference between them is that MS–419 specified 2 types of approved surfacers and MS–419B added 4 more types. MS–419B was disclosed to Zoltek in April 1999. As will be discussed infra, all of the carbon fibers used in these products had to be made in accordance with the specification Qualified Flight Material 145 (QFM–145).

which was classified and of information which was irrelevant to the subject of litigation.

On April 13, 2004, the Court ruled on Zoltek's motions to compel and limited the scope of discovery to the B–2 Program. The Court noted that Zoltek's complaint was not limited to the B–2 Bomber, but was directed to any weapon system. The Court found, however, that Zoltek could not reasonably assert a claim against a Northrop program other than the B–2 program:

> Many of Zoltek's requests reach beyond the B–2 program. For example, Zoltek's 30(b)(6) subpoena lists the following as a subject for deposition: "The use of partially carbonized fibers *on any and all products produced on behalf of or for the United States Government.*" To prove that this discovery is permissible, at a minimum, Zoltek must show either that it has a claim that it reasonably believes to exist against a Northrop program other than the B–2 program, or that its requests are relevant to Zoltek's claim against the B–2 program. Zoltek does not point to specific facts suggesting infringement by any other Northrop program, which is necessary to show that discovery should be expanded beyond the B–2 program. . . .
>
> In light of the fact that Zoltek has not offered evidence of infringement by any other program, this Court hereby confines discovery to the subject matters in the 30(b)(6) subpoena relating to the B–2 program.

*Zoltek Corp. v. United States*, 61 Fed.Cl. at 18 (citations omitted). The Court also considered Northrop's assertion that much of the information Zoltek was requesting was classified. The Court found that the "uses to which the carbonized fibers are put, the ways they are modified, and other factors that allow the carbonized fibers to make the B–2 Bomber what it is, could all implicate national security." *Id.* at 15. Because the Government made an official determination that much of the requested information was classified, the Court limited the scope of discovery to non-classified information.

At the Court's request, on October 5, 2005, Zoltek filed a "Wish List" of discovery requests it would pursue if it were granted the appropriate security clearances and had access to classified information. (Docket No. 295.) The Wish List contained 11 requests for documents and things, and it specified 5 different classes of technical information that should be excluded. The Wish List was to allow the Court to determine if Zoltek's counsel should be required to obtain security clearances. The Court determined that additional discovery would be available and ordered Zoltek's counsel to apply for security clearances. In November 2006, Zoltek's counsel were granted security clearance.

In May 2007, the Government officially invoked the state secrets privilege, which prevented Zoltek from obtaining any classified information despite counsels' security clearances. Zoltek opposed the invocation of the privilege and moved to preclude the Government from asserting it to protect details about the B–2 Bomber, or in the alternative, to have the Court enter an order grating Zoltek a conclusive presumption of infringement. At around this same time, the Government filed a motion for summary judgment based on obviousness, and Zoltek filed several motions in response. While the Court and the parties dealt with the pending motions, general discovery informally was stayed but discovery limited to the motions for summary judgment was permitted.

In February 2009, this Court in an unpublished opinion found that the Government properly invoked the state secrets privilege and denied Zoltek's motion to deny the privilege. The Court found that the privilege precluded Zoltek from inquiring into the relationship or lack thereof between the electrical characteristics of the B–2 aircraft and the carbon fiber products used in its construction. Order, Feb. 13, 2009, at 8, 12 (Docket No. 373). In April 2009, this Court issued a published decision which found that the Government was not precluded from moving for summary judgment despite the invocation of the state secrets privilege. *Zoltek Corp. v. United States*, 86 Fed.Cl. 738 (2009).

Throughout 2009 and 2010, the Court resolved several disputes regarding the Government's motion and expert testimony. On December 16, 2010, the Court denied the Government's motion for summary judgment

based on obviousness. *Zoltek Corp. v. United States*, 95 Fed.Cl. 681 (2010).

In March 2011, Zoltek filed the motion to take additional discovery on several specific issues that had been left unresolved. Its motion was based on testimony, taken in 2001 and 2002, of two employees of Northrop's suppliers[8] that indicated that Northrop may have purchased controlled resistivity fibers and on a letter Mr. Capoccia sent in 1997 to Zoltek stating Northrop's interest in purchasing some fibers from Zoltek. *See* Pl.'s Reply, Apr. 8, 2011, at 7–8, 12 (Docket No. 420). Because it seemed that Northrop had purchased some controlled resistivity carbon fibers, Zoltek believed that Northrop inaccurately had been maintaining that it had no documents responsive to Zoltek's discovery requests. *Id.* at 12–13. Zoltek also believed that Northrop used the purchased fibers to create an infringing sheet, mat, coating, or other product. In seeking additional discovery, Zoltek sought to determine whether Northrop had any previously unmentioned suppliers of partially carbonized fibers and whether any further processing steps were taken by Northrop on any purchased fibers. Zoltek stated that it would prove its case through circumstantial evidence by showing that Northrop purchased or manufactured infringing carbon fiber products and by presenting expert testimony that infringing carbon fiber products were used to produce superior "stealth/low-observable/radar absorbing capability on the B–2." *Id.* at 11.

The Government asserted that discovery was closed and it opposed any additional discovery on liability.

On August 30, 2011, the Court issued the Discovery Order, granting in part Zoltek's motion. As described above, Zoltek's ensuing discovery requests have lead to the dispute at issue now.

---

**8.** These are Louise Hefner and Jozef Venner of BASF. *See* Pl.'s Mot. Reopen Disc., Feb. 22, 2011, at 29, 33 (Docket No. 411).

**9.** RCFC 26 and 45 largely track Fed.R.Civ.P. 26 and 45, respectively, and interpretation of Fed.R.Civ.P. 26 and 45 informs the Court's analysis.

## II. DISCOVERY STANDARDS

██ In general, parties may obtain discovery regarding any unprivileged matter relevant to a claim or defense of any party. Rules of the U.S. Court of Federal Claims ("RCFC") 26(b)(2)(i) (2011). To be relevant, discovery information need not be admissible at trial, it need only be reasonably calculated to lead to the discovery of admissible evidence. *Id.; Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978).[9] Discovery is not, however, unbounded. The court has broad discretion in determining the scope of discovery and in setting limits. *Schism v. United States*, 316 F.3d 1259, 1300 (Fed.Cir.2002); *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 797 (Fed.Cir.1984) ("Questions of the scope and conduct of discovery are, of course, committed to the discretion of the trial court").

██ The court may act to limit discovery on its own initiative or in response to a motion for protection. RCFC 26(c); *JZ Buckingham Investments LLC v. United States*, 78 Fed.Cl. 15, 19 (2007). Under RCFC 26, the court must limit the extent of discovery otherwise allowed if it determines that:

(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, and the importance

---

*See* 2002 Rules Committee Note, Rules of the United States Court of Federal Claims (as amended July 15, 2011) (stating that "interpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the Federal Rules of Civil Procedure").

of the proposed discovery in resolving the issues.

RCFC 26(b)(2).

Under RCFC 45, a party responsible for issuing a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. Pursuant to the rule, the Court must quash or modify a subpoena if it: "requires disclosure of privileged or other protected matter and no exception or waiver applies," or "subjects a person to undue burden." RCFC 45(c)(3)(A).

■ In determining whether a subpoena causes undue burden, courts generally balance the following factors: "(1) relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed." *Jade Trading, LLC v. United States*, 65 Fed. Cl. 188, 190 (Fed.Cl.2005) (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir.2004)). That the person served with a subpoena is not a party to the lawsuit is another factor which may be considered by the court in assessing whether there is undue burden. *Truswal Sys. Corp. v. Hydro–Air Eng'g, Inc.*, 813 F.2d 1207, 1210 (Fed.Cir. 1987).

■ The burden of persuasion in a motion to quash a subpoena is on the movant. *Id.* at 1210. In deciding whether to quash or modify a subpoena, the Court must consider "the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." *Id.* (quoting *Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1024 (Fed.Cir.1986)). In general, modification of a subpoena is preferred to quashing it. *Wiwa*, 392 F.3d at 818.

## III. DISCUSSION

First, the Court will address Northrop's Motion to Quash Zoltek's subpoena. Then, it will address Zoltek's requests for additional discovery and for issuance of a contempt citation.

## A. Northrop's Motion to Quash Zoltek's January 30, 2012 Subpoena

Zoltek's January 30, 2012 subpoena contains 16 requests for documents and things and one RCFC 30(b)(6) request for deposition testimony from one or more Northrop employees regarding those documents. The document requests include most of the requests made in Zoltek's October 2011 subpoena. *See* Def.'s Mot. Quash, Nov. 7, 2011 (Docket No. 427). Zoltek's current document requests are as follows.

Zoltek is seeking:

1. All non-classified documents relating to the manufacture or purchase of carbon fiber products manufactured by the following process:

   (a) oxidizing and stabilizing a carbonizable fiber starting material such as, but not limited to polyacrylonitrile (PAN) through controlled heat treatment;

   (b) partially carbonizing the previously oxidized and stabilized fiber starting material through controlled heat treatment; and

   (c) processing the partially carbonized fiber into generally homogenous sheets, mats, paper[s] or coatings.

2. All non-classified documents relating to the specification of particular volume resistivities for the partially carbonized fibers produced by process steps (a) and (b) of Document Request No. 1, *supra*.

3. All non-classified documents relating to the specification of particular surface resistivities for the sheets, mats, paper, coatings or other products produced by process steps (a), (b), and (c) of Document Request No. 1, *supra*.

4. All non-classified documents relating to the manufacture or purchase of carbon fibers produced by the process described on pages 43–44 of the deposition of Jozef Venner (Attachment 1).

5. All non-classified documents relating to the manufacture or purchase of BASF CELION CELECT ® SEC fibers.

6. All non-classified documents relating to the manufacture or purchase of carbon fibers produced by the process described

in the Declaration of Louise A. Hefner (Attachment 2).

7. All non-classified documents relating to the manufacture or purchase of BASF CELION CELECT ® SEC fibers, as described in the BASF Structural Materials, Inc. flyer (Attachment 3).

8. All non-classified documents relating to the manufacture or purchase of carbon fibers having the same electrical properties to CELION CELECT ® SEC carbon fibers as described in Attachment 3.

9. All non-classified documents relating to the manufacture or purchase from any source of carbon fiber sheets, mats, paper, coatings or other products having surface resistivities ranging from 24 to 3000 ohms/square, as described in George Rodgers' letter dated August 6, 1987 (Attachment 4).

10. All non-classified documents relating to the manufacture or purchase from any source of controlled resistivity carbon fibers referred to in the communication from Michael Capoccia of Northrop Grumman's B–2 Division to Andrea Dry of Zoltek, Inc. dated February 21, 1997 (Attachment 5).

11. All non-classified documents relating to the manufacture or purchase of carbon fiber products from WLS Coatings, Inc., as described in the deposition of Victor Nano (Attachment 6).

12. All non-classified documents relating to the manufacture or purchase from any source of carbon fiber sheets, mats, paper, coatings or other products having surface resistivities above 15 ohms/square.

13. All non-classified documents relating to the manufacture of sheets, mats, paper, coatings or other products containing BASF CELION CELECT ® SEC carbon fibers, or carbon fibers having the same electrical properties to BASF CELION CELECT ® SEC carbon fibers as described in Attachment 3.

14. All non-classified Northrop documents provided to Michael A. Urig in preparation for his Declaration dated September 11, 1998.

15. All non-classified documents relating to the manufacture or purchase of carbon fibers having volume resistivities specified by Northrop.

16. All non-classified documents relating to the manufacture or purchase of carbon fibers that is less than 95% carbonized.

In its subpoena, Zoltek stated that in accordance "with the Court's Order of August 30, 2011, no documents are being requested: (a) disclosing the cost of the carbon fiber products referred to in the Document Requests [ ]; or (b) relating to what final use Northrop made of the carbon fiber products identified in the Document Requests. It is expected that any information regarding items (a) or (b) supra would be redacted from documents that are required to be produced as being otherwise responsive to this request."

In their briefs supporting Northrop's Motion to Quash, the Government and Northrop raise several general objections that apply to all of the requests. They also raise more specific objections for each request. The Court reviews the general objections before turning to the specific objections.

### 1. The General Objections to Zoltek's Requests

#### a) The Government's, Northrop's, and Zoltek's Arguments

Northrop and the Government make several general arguments about why the requests are improper. Essentially, they argue that the requests are unduly broad because they are not limited to the B–2, are cumulative or duplicative, and request accounting information.

Northrop argues that Zoltek's requests are unduly broad because they are not limited to partially carbonized fibers used on the B–2 Bomber and instead cover all types of carbon fibers contained in any product created by Northrop. Northrop also argues that, to the extent the requests are limited to the B–2, the requests are cumulative because all responsive information was produced to Zoltek long ago. Northrop asserts that Zoltek has been making the same discovery requests for over a decade, and the most recent requests place an undue burden on Northrop, a non-party to this case, "and borders on harass-

ment, warranting an order quashing the subpoena." Northrop's Mot. Quash, Feb. 21, 2012, at 2 (Docket No. 443).

The Government similarly argues that Zoltek's requests are not relevant to Zoltek's claims against the United States because the requests are not related to the B–2 but are directed to all of Northrop's activities. The Government also asserts that, if the requests are limited to the B–2, they are unreasonably cumulative or duplicative because Zoltek already has all the carbon fiber specifications, the identity of the manufacturers of fibers, and any related information for products used on the B–2.

The Government also argues that the requests are unduly broad because Zoltek seeks discovery of accounting information. The Government asserts that most of Zoltek's requests ask for "all non-classified documents relating to the purchase of" carbon fibers and carbon fiber products. Def.'s Br. Mot. Quash, Feb. 21, 2012, at 9 (Docket No. 444). The Government states that requests for accounting information were precluded by the Discovery Order. The Government notes that Zoltek requests Northrop to redact cost information, but argues that such redaction would not prevent the disclosure of accounting information and does not save the requests from being overbroad.

Zoltek acknowledges that its requests are not limited to the B–2, but it asserts it should be permitted to seek the broader discovery for two reasons: (1) the state secrets privilege prevents it from obtaining discovery on whether partially carbonized fibers were used on the B–2 Bomber and (2) Zoltek's complaint is not limited to the B–2 Bomber. Zoltek argues that the information it seeks "is clearly relevant to establishing liability and damages in this case." Pl.'s Resp., Feb. 28, 2012, at 13 (Docket No. 445). Zoltek asserts that by limiting discovery to the B–2 Bomber and by denying its motion to strike the Government's invocation of the state secrets privilege, the Court has prevented Zoltek from proving its case and may "deny Zoltek its due process rights." *Id.* at 14.

Zoltek also argues that it is seeking to determine whether Northrop purchased partially carbonized fibers from BASF and other manufacturers, and then processed those partially carbonized fibers into sheets, mats or coatings having controlled surface resistivities dependent upon the volume resistivities of the fibers. Zoltek asserts its requests are necessary for it to make that determination.

**b) The Court Agrees that Zoltek's January 30, 2012 Subpoena Is Not Properly Tailored to the Scope of Discovery.**

On August 30, 2011, the Court permitted Zoltek to seek additional discovery for a very limited purpose and subject to explicit limitations. The Court expected Zoltek to tailor its requests to fit that purpose. Zoltek was permitted to seek document discovery of the items in its Wish List and of the documents that Mr. Urig relied upon in preparing his September 11, 1998 Declaration. Such discovery was permitted only insofar as the items requested did not relate to accounting issues or to Northrop's use of the fibers, and were not subject to the state secrets privilege. Discovery also was limited by the Court's prior order restricting discovery to: (a) the B–2 program, (b) liability/infringement issues, and (c) non-classified information.

With those limitations in mind, Zoltek's subpoena suffers from two immediate, facial problems. The first is that Zoltek made little attempt at crafting specific requests that would avoid encompassing information outside the permitted scope of discovery. The second is that many of the requests bear no obvious relation to Zoltek's Wish List or to the other narrow categories of document discovery permitted by the Court's Discovery Order.

As for the first problem, instead of seeking discovery of narrow, specific classes of information, Zoltek has requested huge swaths of information. Zoltek is requesting any document about carbon fiber products from any part of Northrop. Zoltek has not linked the documents in any way to the B–2 program.[10]

---

10. The Court has recognized that Zoltek may seek limited discovery beyond the program, but that discovery is conditional upon its being ra-

tionally related to obtaining information about the B–2 program. *See Zoltek Corp. v. United States,* 61 Fed.Cl. at 18; Hr'g Tr., Sept. 21, 2005,

Nor does Zoltek limit its requests to a specific time frame, and thus seeks documents that pre-date the B–2 program. Zoltek also makes an inadequate effort to limit the accounting information it is requesting. It requests all documents related to the purchase of fibers with the caveat that prices be redacted. The Court authorized Zoltek to seek limited discovery regarding suppliers of partially carbonized fibers, but it did not authorize Zoltek to seek accounting information. Zoltek's requests are not directed to discovering other suppliers of fibers, but are directed to accounting more generally. Zoltek appears to admit as much because it argues in opposition that the information it seeks "is clearly relevant to establishing liability *and damages* in this case." Pl.'s Resp., Feb. 28, 2012, at 13 (Docket No. 445) (emphasis added).

Instead of tailoring its requests to reveal the information it allegedly is seeking, Zoltek makes broad requests leaving it to Northrop and the Court to fashion appropriate limitations. Zoltek has not made a reasonable attempt to limit its discovery requests to information relevant to its claim against the B–2 or to limit the breadth of the requests as required by RCFC 45(c)(1).

As for the second problem, Zoltek's subpoena bears little resemblance to its Wish List. The biggest difference is that, while the Wish List requests were limited to "partially carbonized fibers," the current requests are directed to carbon fibers more generally. Zoltek currently specifies several types of carbon fibers about which it is seeking information, most of which are broader than the definition of "partially carbonized fibers." *See Claim Construction Opinion,* 48 Fed.Cl. at 295. That the requests are broader is notable because even the original Wish List was broader than it should have been. In describing the Wish List, the Court observed that, "Rather than enumerating the discov-

ery it seeks 'with great specificity,' Zoltek's list was even broader and more general than its previous discovery requests." Order, Feb. 13, 2009, at 7 (Docket No. 373). The Court specifically noted that "despite the Court's prior restriction of Zoltek's discovery to information pertaining only to the B–2," Zoltek did not limit its Wish List requests to the B–2. *Id.* at 7 n. 5.

The lack of specificity in Zoltek's January 30, 2012 subpoena is especially significant in light of the repeated warnings given to Zoltek about the need to make specific discovery requests. After it issued the Discovery Order on August 30, 2011, the Court informed Zoltek of the need to be very specific in its discovery requests. At a September 9, 2011 status conference, the Government stated that discovery of the Wish List items would be problematic due to the state secrets privilege. Status Conf. Tr., Sept. 9, 2011, at 29–30 (Docket No. 424). The Court told Zoltek that, in "refin[ing] this wish list to a request for specific documents," it was "very important" for Zoltek to be "as specific as possible in your requests" to maximize the chances that Zoltek actually would get information. *Id.* Although Mr. Monco was not the attorney of record at the time, the Court informed Mr. Monco of the need for specificity at a subsequent status conference. Status Conf. Tr., Nov. 9, 2011, at 7 (Docket No. 431).

After Zoltek served its October 17, 2011 subpoenas, the potential problems with the discovery requests were brought to its attention on numerous occasions. In the Government's motion to quash the October subpoena, it noted that 5 requests covered information protected by the state secrets privilege. Both the Government and Northrop objected to Zoltek's failure to limit the requests to the B–2. At a status conference held on November 9, 2011, the Court stated that, while it was not making a deci-

at 33–37 (Docket No. 294). For example, the Court recently permitted Zoltek to question Mr. Capoccia regarding whether Northrop purchased partially carbonized fibers for other programs. *See* Pl.'s Resp., Feb. 28, 2011, Ex. 11 (Docket No. 445). The Court stated that Zoltek could question the witness about Northrop's activities outside of the B–2 program, but the questions had to be limited in number and scope. *Id.* at Ex. 11,

A144. The Court also stated that if, based on Mr. Capoccia's answers, Zoltek wanted to pursue any document requests, Zoltek would have to establish that the requests were both within the scope of discovery and relevant to the B–2 program. *Id.* Mr. Capoccia testified that, to the extent he knew, Northrop did not purchase any partially carbonized fibers for any program. *Id.* at Ex. 11, A147.

sion, it seemed that Zoltek had not complied with the Court's instructions to make the requests as specific as possible. Status Conf. Tr., Nov. 9, 2011, at 6–7 (Docket No. 431).

The Court again brought to Mr. Monco's attention the lack of specificity in Zoltek's discovery requests at a January 23, 2012 status conference. The Court noted that the Government objected to the October 2011 subpoena as not focused on the B–2 and not "tailored enough for the revealing of admissible evidence for the case at hand as opposed to some broader purpose." Status Conf. Tr., Jan. 23, 2012, at 13 (Docket No. 442). The Court stated that Zoltek could conduct discovery within the rules of the Court in whatever manner it wished, but it warned Mr. Monco that he should consider what would happen in the end if his requests were found to be too broad. *Id.* at 16.

Moreover, Mr. Monco has made substantially similar discovery requests in the past and this is not the first time that Mr. Monco has been warned about the requests' over breadth. In an October 31, 2001 subpoena issued to Northrop, Zoltek requested production of "all documents and things relating to partially carbonized fibers, and sheets/mats/coatings containing partially carbonized fibers" and of "all documents and things relating to the manufacture, purchase and/or use of partially carbonized fibers and sheets/mats/coatings containing partially carbonized fibers on any U.S. Government weapons systems, including but not limited to the B–2 Bomber." Zoltek then filed a motion to compel production of these documents. As discussed, on April 13, 2004, the Court issued an order finding that Zoltek had not established that it could assert a plausible claim of infringement against any program other than the B–2, and therefore, discovery was limited to the documents and things relating to fibers "used on the B–2 Bomber." The Court found that "on any Government weapons systems" was too broad. *Zoltek Corp. v. United States*, 61 Fed.Cl. at 18–19.

Subsequently, Zoltek filed a motion to modify the April 13, 2004 Order. At the hearing on the motion, the Court warned Mr.

Monco about making broad, vague discovery requests. In discussing Zoltek's discovery requests, the Court stated: "the problem that I have, Mr. Monco, is that ... throughout this case ... I found that there is a lacking of a kind of precise organization and specificity on your side that makes it very difficult for me to make a judgment, and I think it makes it difficult for the Defendant to reply." Hr'g Tr., Sept. 21, 2005, at 41–42 (Docket No. 294). As described above, the Court similarly admonished Mr. Monco in an order, dated February 13, 2009, stating that "Rather than enumerating the discovery it seeks 'with great specificity,' Zoltek's list was even broader and more general than its previous discovery requests." Order, Feb. 13, 2009, at 7 (Docket No. 373).

Turning back to the January 30, 2012 subpoena, Zoltek made little attempt at tailoring its requests to the scope of discovery set forth by the Court's orders or to the scope of information it claims to have been seeking. Zoltek's failure in this respect is particularly egregious given the numerous warnings it received regarding the need for specificity in its discovery requests. Zoltek is seeking all documents relating to the manufacture or purchase of carbon fibers or carbon fiber products by Northrop as a whole. Zoltek has not limited or otherwise anchored its requests to the B–2 program. Zoltek has not limited its requests in time. Zoltek plainly seeks information relevant to accounting but not to liability. The Government and Northrop have voiced their objection to this type of unbounded discovery in the past. And the Court has restricted this type of unbounded discovery in the past.

Throughout the course of this litigation, the Court has been sympathetic to the legal hurdles that Zoltek has faced. The Court understands the difficulties the Government's invocation of the state secrets privilege has caused for Zoltek. Those difficulties do not, however, give Zoltek the right to ignore the Court's orders. When Zoltek moved the Court in March 2011 for additional discovery, it recognized that discovery was limited to only the B–2 program and that any requests beyond the program would need to be "narrowly tailored" to discovering information re-

lated to the B–2 program. Pl.'s Resub. Mot. Reopen Disc., Mar. 11, 2011, at 30 (Docket No. 416). After the Court issued its Discovery Order, Zoltek did not move the Court to reconsider its prior discovery rulings. Zoltek knew that discovery of the Wish List items would present difficulties from the status conferences with the Court and also because the Government stated in 2007 that the state secrets privilege would prevent Zoltek from obtaining discovery of many of the specific requests in the Wish List. *See* Def.'s Memo, May 22, 2007 (Docket No. 341). Instead of making its document requests narrower and more specific, as it was told to do to maximize its chances of receiving responses, Zoltek expanded its document requests. Zoltek was warned about the limitations on discovery on numerous occasions and it cannot reasonably claim that enforcement of those limitations deprives it of due process. That the state secrets privilege protects information regarding the B–2 does not entitle Zoltek to seek expansive new discovery on any Northrop program.

In determining whether a subpoena causes undue burden, courts generally balance the (1) relevance of the information; (2) the need of the party for the documents; (3) the breadth of the request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed.

The Court agrees with Northrop and the Government that Zoltek's requests are overly broad because they plainly exceed the authorized scope of discovery. The Court finds that Zoltek's requests, as written, place an undue burden on Northrop and must be modified or quashed. The Court therefore limits Zoltek's discovery requests as follows. Because the Court has ruled that Zoltek cannot seek discovery beyond the B–2 program and Zoltek has not articulated any connection between its requests and the B–2

program, the Court modifies Zoltek's requests to limit them to information pertaining to the B–2 program and to components actually used on the B–2. Because Zoltek has not tailored its requests to focus on the discovery of Northrop's suppliers, the Court quashes Zoltek's requests for documents relating to "the purchase of" carbon fibers and carbon fiber products. Because Zoltek has not limited the time periods covered by the requests, the Court modifies them to be limited to 1984 through the present.[11] With these modifications made,[12] the Court will consider the requests and specific objections.

**2. Zoltek's Specific Document Requests**

■ Both Northrop and the Government assert that several of the requests ask for information covered by the state secrets privilege. Because RCFC 45(c)(3)(A) requires the Court to quash any discovery request that asks for "disclosure of privileged or other protected matter," the Court will address this objection first. The Court has found that the Government properly invoked the privilege as to any information that relates to "the relationship or lack thereof between the electrical characteristics of the B–2 aircraft and the carbon fibers used in its construction." Order, Feb. 13, 2009 (Docket No. 373). Therefore, the Court must quash Zoltek's requests to the extent Zoltek is seeking information that relates to the electrical characteristics of the B–2 and the carbon fibers used in its construction.

The Government asserts that requests 2, 3, 9, 10, and 12 of the January 30, 2012 subpoena seek information that would be covered by the state secrets privilege.[13] That these requests encompass privileged information cannot come as a surprise to Zoltek; the Government's November 2011 motion to quash gave Zoltek ample notice that documents could not be produced in response to these

---

**11.** This is the date range used by Zoltek in its First Set of Interrogatories and in its recent questioning of Mr. Capoccia.

**12.** These modifications do not apply to Document Request No. 14, which the Court discusses below.

**13.** Although the Government did not raise the state secrets privilege in its brief supporting Northrop's Motion to Quash the January 30, 2012 subpoena, the Government did raise the privilege in its November 7, 2011 Motion to Quash Zoltek's October 17, 2011 subpoena. The October 17, 2011 subpoena and the January 30, 2012 subpoena contain nearly identical requests.

requests. In drafting the January 2012 subpoena, Zoltek did not change its requests.

Northrop asserts that requests 4 to 8, 13, and 15 also are covered by the state secrets privilege because they request disclosure of information regarding Celion Celect SEC carbon fibers or other fibers having specified volume resistivities. In the depositions of Messrs. Rodgers and Capoccia in January 2012, the Government invoked the state secrets privilege to the question "Within the scope of the B–2 program, has Northrop Grumman purchased from BASF Celion Celect SEC carbon fibers?" Northrop Mot. Quash, Feb. 21, 2012, at 18 (Docket No. 443). Although the objection is raised by Northrop, it is clear to the Court that the Government would raise the objection were Northrop ordered to produce any responsive information. The Government has objected to disclosure of the same information in the past, and the Court discussed those objections with the parties in an emergency status conference on January 20, 2012, during the deposition of Mr. Capoccia. *See* Pl.'s Resp., Feb. 28, 2012, Ex. 11, A142 (Docket No. 445).

The Court agrees with Northrop and the Government that the discovery requests primarily are directed to obtaining information covered by the invocation of the privilege. Because the requests are directed to obtaining privileged information (i.e., information about the resistivity of products containing carbon fibers), they cannot be modified to save them. Therefore, the Court quashes requests 2 through 10, 12, 13, and 15.

This leaves requests 1, 11, 14, and 16. It also leaves the request for deposition testimony. The Court will address the remaining requests in turn.

#### a) Request Number 1

1. All non-classified documents relating to the manufacture or purchase of carbon fiber products manufactured by the following process:

(a) oxidizing and stabilizing a carbonizable fiber starting material such as, but not limited to polyacrylonitrile (PAN) through controlled heat treatment;

(b) partially carbonizing the previously oxidized and stabilized fiber starting material through controlled heat treatment; and

(c) processing the partially carbonized fiber into generally homogenous sheets, mats, paper[s] or coatings.

At the outset, the Court notes that it has decided to limit this request to materials used on the B–2, to limit it to documents from 1984 to the present, and to quash the request for documents that relate to the "purchase of" carbon fiber products.

This request is unduly burdensome at this late state of the litigation because if the manufacturing process was not described in the component specifications, Northrop has no way of knowing the processes used by its vendors to produce the products.[14] Northrop would need to ask its vendors, which Zoltek also is able to do. Between 1999 and 2001, the Government and Northrop disclosed all of the specifications for and the manufacturers of the products containing carbon fibers that were approved for use on the B–2. Zoltek had ample opportunity to take discovery from the manufacturers to determine which products were made from the process described in this request, and did so on several occasions. There is no reason to require Northrop to make the inquiry instead of having Zoltek inquire itself. Moreover, given Zoltek's unhappiness with Mr. Urig's analysis, it seems that Zoltek would be better off analyzing the products rather than leaving the analysis to Northrop.

Zoltek has other means of obtaining the information about the manufacture of carbon fiber products that are less burdensome on Northrop. *See* RCFC 26(b)(2). Therefore, the Court limits the scope of this request to

14. The Court notes how broad this request would have been were it not limited to the B–2 program. To determine if it made or purchased any products manufactured by the described process, Northrop would need to undertake an in-depth analysis, similar to Mr. Urig's 1998 analysis, for every program in the company and then get permission to release any classified or sensitive information. Because Zoltek cannot reasonably assert a claim against any other program, such an unbounded request is unduly burdensome.

the information already produced, and Northrop need not respond to the request.

### b) Request Number 11

11. All non-classified documents relating to the manufacture or purchase of carbon fiber products from WLS Coatings, Inc., as described in the deposition of Victor Nano (Attachment 6).

At the outset, the Court notes that it has decided to limit this request to materials used on the B–2, to limit it to documents from 1984 to the present, and to quash the request for documents that relate to the "purchase of" carbon fiber products. Therefore, the modified request is for "All non-classified documents, dated 1984 or later, relating to the manufacture of carbon fiber products that are used on the B–2 Bomber from WLS Coatings, Inc., as described in the deposition of Victor Nano (Attachment 6)."

WLS Coatings manufactured products for Northrop that met specification MS–419B.[15] Zoltek has been asserting that MS–419B potentially infringes its patent and that the Government and Northrop have wrongly been denying Zoltek discovery of information about MS–419B. This request is narrower than Request Number 1 because it is seeking documents relating to the carbon fiber products used by a specific company.

Victor Nano was an employee of WLS Coatings. He testified that in producing MS–419B compliant products, WLS Coatings used carbon fibers that were compliant with Northrop Specification Qualified Flight Material ("QFM") 145. QFM–145 was produced to Zoltek more than 12 years ago. Mr. Nano testified that the fibers used in MS–419B products were purchased from Fortafil Fibers. Zoltek deposed Gordon Sharpe, an employee of Fortafil Fibers, on May 2, 2006. Fortafil describes its QFM–145 products as high strength, intermediate modulus fibers that are 95% carbon. Mr. Sharpe testified that Fortafil never made a variable resistivity, partially carbonized product.

Zoltek asserts that it is entitled to all communications between WLS Coatings and Northrop regarding any products made to MS–419B.

Northrop asserts that to the extent the request is limited to the B–2, it is cumulative because the Government has produced all of the specifications, and Zoltek has taken discovery from WLS Coatings. Northrop's Mot. Quash, Feb. 21, 2012, at 21 (Docket No. 444).

The Government argues that MS–419B is irrelevant because the fibers are covered in a metallic substance which controls the resistivity of the final product, and therefore, the product cannot infringe Zoltek's patent. It also argues that the testimony of the Fortafil Fibers employee shows that QFM–145 was not a partially carbonized fiber and that MS–419B did not contain any partially carbonized fibers.

■ Unlike many of Zoltek's other requests, this request identifies a class of documents that relate to a specific set of products from a specific manufacturer. The relevance of the documents is clear because Zoltek is asserting that the products made to specification MS–419B are infringing. Although it seems unlikely, based on the evidence presented to the Court so far, that products made to meet MS–419B are infringing, Zoltek may seek discovery of information relating to the manufacturing processes used to produce those products and the carbon fibers contained within those products.

To the extent that the requested information already has been produced to Zoltek, Northrop does not need to reproduce documents. For example, Northrop need not produce the specifications of the products manufactured by WLS Coatings because they already have been disclosed. However, Northrop should produce any other documents that it has that describe, discuss, or otherwise specify the manufacturing processes used by WLS Coatings to create products made to specification MS–419B and that describe, discuss, or otherwise specify the types of carbon fibers that WLS Coatings should use. If any responsive documents exist,

---

**15.** For simplicity, in this section the reference to MS–419B encompasses both MS–419 and MS– 419B.

Northrop must produce those to Zoltek to the extent that they are non-classified and nonprivileged.

#### c) Request Number 14

14. All non-classified Northrop documents provided to Michael A. Urig in preparation for his Declaration dated September 11, 1998.

When Mr. Urig prepared his list of carbon fiber products, he verified it by checking with information given to him by Northrop. If Northrop provided Mr. Urig with documents that have not yet been produced by either the Government or Northrop, Northrop must produce those documents if they are non-classified and non-privileged.

In its response, Zoltek asserts that it is seeking any communications between Mr. Urig and Patty Jones and Ron Meidlinger, both Northrop employees. To the extent such communications are "documents provided to [Mr.] Urig in preparation for his Declaration" and are non-classified and non-privileged, such communications must be produced if Northrop has not done so already.

The Court notes that Zoltek was able to identify in its response specific communications that it was seeking in making this request. The particularity in its response as compared to the broad and vague original request is indicative of the general lack of precision in Zoltek's discovery requests. Zoltek was seeking specific documents, but did not specify these documents in its request.

#### d) Request Number 16

16. All non-classified documents relating to the manufacture or purchase of carbon fibers that is less than 95% carbonized.

At the outset, the Court notes that it has decided to limit this request to materials used on the B–2, to limit it to documents from 1984 to the present, and to quash the request for documents that relate to the "purchase of" carbon fiber products.

The Government already has produced all of the specifications of carbon fiber products that are approved for use on the B–2. For the same reasons as Request Number 1, the scope of this request is limited to the documents already produced, and Northrop need not respond to the request.

#### e) Request for Deposition Testimony

Zoltek requests testimony from one or more Northrop employees regarding:

[t]he manufacture and purchase of carbon fiber products identified in Nos. 1–16 on the List of Documents attached to this Subpoena [and]

[t]he identity of former Northrop employee(s) most knowledgeable regarding the manufacture and purchase of carbon fiber products identified in Nos. 1–16 on the List of Documents attached to this Subpoena.

For the same reasons that the Court limited the document requests to the B–2, the deposition requests are denied—Zoltek has not articulated any connection between the testimony it seeks and the B–2 program.

#### 3. Compliance with the Subpoena

Pursuant to the Court's September 9, 2011 Order, fact discovery closed on March 1, 2012. However, because the subpoena was issued prior to the close of discovery, the Court in this instance will require Northrop to respond to Request Numbers 11 and 14 as modified by the Court. In responding to the requests, if Northrop cannot produce any information because it is subject to the state secrets privilege, it should state the category of documents protected and the reason they are not being produced. While Northrop must respond to the requests, Zoltek may not seek any additional fact discovery.

#### B. Zoltek's Request to Enlarge Discovery

Having resolved the issues with the subpoena, the Court turns to the requests Zoltek made in its February 28, 2012 Response to the Motion to Quash. In its Response, Zoltek appears to make several requests for relief, although the precise scope of its requests is not entirely clear. The stated basis for its requests is its February 16, 2012 deposition of Mr. Urig.[16] It seems that Zoltek

16. The deposition was taken pursuant to the Dis- covery Order, which permitted Zoltek to depose

is asking that discovery be enlarged in time, as it wants to discuss the implications of Mr. Urig's testimony "for discovery in this case going forward," Pl.'s Resp., Feb. 28, 2012, at 3 (Docket No. 445), and in scope, as it asserts further discovery should not be limited to the B–2, *id.* at 13–14. Zoltek also requests the Court to find Northrop in contempt for failing to produce certain documents in 2004 and 2005. *Id.* at 10.

Zoltek filed the transcript of Mr. Urig's deposition with its Response. *Id.* at Ex. 2. The transcript shows that, in his recent deposition, Mr. Urig described the methodology he used to determine that the B–2 did not contain any materials responsive to Zoltek's interrogatories. As in his September 11, 1998 Declaration, he described his methodology as follows: he created a master list of products approved for the B–2 that contained carbon fiber, he eliminated those not used on the B–2, he eliminated those coated with a metallic substance, he eliminated those used for structural purposes, and then he investigated the remaining specifications to determine whether they called for a specified surface resistivity. Mr. Urig stated that he concluded no information was responsive because none of the specifications called for carbon fiber products with controlled surface resistivity. He stated that he felt the prior interrogatory responses were inaccurate because it seemed that the prior investigation happened too quickly for a proper evaluation of the B–2's components in light of the idiosyncratic definitions used in Zoltek's interrogatories. *Id.* at Ex. 2, A15–A18.

Based on Mr. Urig's deposition testimony, Zoltek claims that Mr. Urig's original investigation was flawed and that the B–2 actually does use the carbon fiber products having controlled electrical surface resistivity as described by Zoltek. *Id.* at 2. Zoltek argues that the Government has been denying Zoltek discovery of responsive information for the past 14 years. *Id.* at 2–3. It also argues that Mr. Urig's testimony shows that MS–419 and MS–419B contain partially carbonized fibers, and therefore, Northrop failed to

produce documents in response to this Court's April 13, 2004 Order. *Id.* at 10.

Both the Government and Northrop assert that no new information was revealed in Mr. Urig's deposition. Northrop asserts that Zoltek "drastically mischaracterizes the substance of [ ] Michael Urig['s deposition] as revealing 'new evidence' that partially carbonized fibers with controlled resistivity ... were used on the B–2 Bomber," in the "apparent hope [ ] that by characterizing the recent testimony as providing new evidence, it can reopen and expand discovery in this case—which has been pending for 16 years...." Northrop's Reply, Mar. 12, 2012, at 1 (Docket No. 448). Northrop also argues that in responding to Zoltek's discovery requests it properly relied on this Court's orders limiting the scope of discovery, on Mr. Urig's analysis, and on the Government's position regarding the use of partially carbonized fibers on the B–2.

■ The Court finds that Zoltek has not established that it is entitled to additional discovery. The Court agrees with the Government and Northrop that no significant new information was uncovered in Mr. Urig's February 16, 2012 deposition. Zoltek merely confirmed what it has known since at least 1999—that it believes the methodology Mr. Urig used in 1998 was flawed. By 2001, Zoltek had been provided with all the specifications and samples of the products so that it could conduct its own analysis and would not have to rely on Mr. Urig's opinion. The Court also agrees with Northrop and the Government that Northrop did not fail to produce documents as alleged by Zoltek. As the Court will explain, both of Zoltek's contentions are without merit.

### 1. Nothing New Was Revealed in Mr. Urig's Deposition.

Zoltek argues that Mr. Urig's deposition shows that components of the B–2 contain partially carbonized fibers. Pl.'s Resp., Feb. 28, 2012, at 2–3 (Docket No. 445). It is not clear from Zoltek's brief or Mr. Urig's testimony how Zoltek reaches this conclusion. It is clear, however, that Zoltek is arguing that

Mr. Urig to inquire as to why Mr. Urig concluded in 1998 that the B–2 did not use the described

fibers and to why the Government changed its interrogatory responses.

Mr. Urig's 1998 analysis was flawed, that Zoltek only recently discovered the flaws, that the flaws have prevented Zoltek from obtaining discovery, and therefore, Zoltek is entitled to additional discovery.

Zoltek argues that Mr. Urig's analysis was incomplete because he improperly eliminated products from his list and he did not consider all the relevant specifications. *Id.* at 4–6. Zoltek asked Mr. Urig whether he investigated the method used to manufacture the carbon fibers in the specifications which he eliminated because they were coated with a metallic substance or were structural. Mr. Urig responded that he did not. *Id.* Zoltek has argued that Mr. Urig's elimination of such products without investigating the method of manufacturing was the equivalent of granting summary judgment to the Government.

Zoltek also asserts the analysis was incomplete because Mr. Urig failed to consider MS–419 and MS–419B, two specifications that describe a carbon fiber product that was coated with a metallic coating. *Id.* The final metallic-coated product had a specified surface resistivity. *Id.* Zoltek presented Mr. Urig with the specifications and asked him if he considered those specifications in his original investigation. Mr. Urig stated that he had not, but explained that those carbon fiber products were coated with a metallic coating so he would have eliminated those specifications from his list even if they were on there. Zoltek asserts that those products contain partially carbonized fibers, casting a shadow of doubt on the accuracy of Mr. Urig's analysis. *Id.* at 9–10.

Zoltek asserts that Mr. Urig's deposition testimony shows that he did not consider all the carbon fiber products, that MS–419 and MS–419B were responsive to the First Set of Interrogatories and should have been disclosed, and that other products also may be responsive to Zoltek's interrogatory. Zoltek argues that all the documents related to MS–419 and MS–419B should be produced and any other relevant documents should be produced as well. It claims that this information wrongfully has been withheld for many years.

In response, the Government argues that Zoltek's argument is not new and simply is a rehashing of the argument Zoltek made in July 1999 in its Second Motion to Compel (Docket No. 65). Def.'s Reply, Mar. 12, 2012, at 1 (Docket No. 447). In 1999, in response to essentially the same complaint, the Government states it provided Zoltek with all the documents and specifications that Mr. Urig used in his analysis and the Court granted Zoltek discovery of samples of each carbon fiber product. The Government argues that Mr. Urig's evaluation was accurate because he was responding to the questions and definitions contained in Zoltek's interrogatories. *Id.* at 11–12. It asserts that, even if Mr. Urig's analysis was flawed, Zoltek was provided with all the specifications, suppliers, and manufacturers so that Zoltek could investigate the products itself. The Government asserts that Zoltek now has had ample opportunity to pursue discovery from the manufacturers of all the products.

The Government argues that Zoltek's contention that MS–419 and MS–419B contain partially carbonized fibers was first asserted in its Second Motion to Compel, and Zoltek has taken discovery from the manufacturers of MS–419 and MS–419B compliant products. The Government also notes that that Mr. Urig was mistaken when he recently testified that he did not consider MS–419 in 1998,[17] as the documentary evidence shows that he did and the specifications for those products were turned over to Zoltek long ago. Based on Zoltek's depositions of the manufacturers, all of the manufacturers all used carbon fibers made by one producer, Fortafil Fibers. Zoltek deposed Gordon Sharpe of Fortafil on May 2, 2006, and Mr. Sharpe testified that Fortafil never made a variable resistivity, partially carbonized fiber. The Government argues that Zoltek has been investigating MS–419 and MS–419B for many years and that Zoltek's contention that Mr. Urig's deposition revealed anything new is frivolous. Northrop also argues that Zoltek has been in

---

17. It is undisputed that MS–419B, which is dated November 30, 1998, did not exist until after Mr. Urig completed his analysis in September 1998.

possession of the MS–419 and MS–419B specifications and samples thereof since 2001. Northrop's Reply, Mar. 12, 2012, at 1 (Docket No. 448).

When Zoltek first complained about Mr. Urig's analysis, the Court was sympathetic to Zoltek's claims. The Court granted-in-part Zoltek's July 1999 Second Motion to Compel, and ordered the Government to produce to Zoltek samples of all the carbon fiber containing products used on the B–2. Order, Mar. 16, 2001 (Docket No. 153); ·Notice, May 15, 2001 (Docket No. 158). At that time, Zoltek had all the specifications for the products used on the B–2, including MS–419 and MS–419B. In fact, the Court had a lengthy discussion with the parties regarding MS–419 at the March 16, 2001 hearing on the Second Motion to Compel. The Court was under the impression that, armed with the specifications and the samples, Zoltek would endeavor to undertake its own analysis and determine whether any products were made pursuant to the patented process. The record shows that Zoltek has taken discovery from the manufacturers of those components, and from those manufacturers' suppliers.

Zoltek again argues that Mr. Urig's analysis was flawed and that it is entitled to additional discovery, despite the fact that Mr. Urig's explanation of his methodology was, for all purposes, identical to the description contained in his Declaration. Zoltek has been complaining about the same aspects of Mr. Urig's methodology for many years and Zoltek had, in 2001, all of the information it needed to perform its own analysis. Zoltek has had ample opportunity to investigate the manufacturing method used to produce MS–419 and any other carbon fiber products that are used on the B–2. If Zoltek felt that Mr. Urig missed products containing partially carbonized fibers because he eliminated structural carbon or carbon fibers coated in metallic substances, Zoltek should have taken depositions of the manufacturers of those products to determine the nature of the carbon fibers.

Additionally, Zoltek appears to fault Mr. Urig for relying on the definitions Zoltek set forth in its First Set of Interrogatories. Zoltek complains that Mr. Urig observed Zoltek's definition of "Stealth technology," which it defined as any technology that uses carbon fiber products to render the object radar absorbing. Pl.'s Resp., Feb. 28, 2012, at 5 n. 1 (Docket No. 445). Similarly, at the deposition, Zoltek asked Mr. Urig the following questions.

Q: As you sit here today, Mr. Urig, do you understand the definition of the term carbon fibers as used in the interrogatories?

. . .

Q: . . . In doing your—in performing your methodology, did you look for material specifications for products that conformed with the definition of carbon fibers that you now understand to be the governing definition?

. . .

Q: And with your definition of carbon fiber that we have just talked about now in the last couple of questions, your methodologies would have flagged fibers that were partially carbonized . . . ?

Zoltek's Resp., Feb. 28, 2012, Ex 2 at A39 (transcript of Mr. Urig's deposition) (Docket No. 445). Zoltek's complaint seems to be that Mr. Urig's reliance on the interrogatory definitions unduly narrowed his analysis. In responding to Zoltek's interrogatories, Mr. Urig cannot be faulted for relying on the definitions in the interrogatories. Moreover, his reliance on those definitions plainly is stated in the Declaration itself, *see* Urig Decl. at ¶ 6, which Zoltek has had since September 1998. Therefore, Zoltek cannot credibly claim that Mr. Urig's reliance on Zoltek's definitions is new information or that any flaws in his analysis now entitle Zoltek to additional discovery.

In seeking the additional discovery, it is apparent that Zoltek has been unhappy with the responses it received to prior requests. In each iteration of its discovery requests, Zoltek has been trying to expand the scope of information it is seeking. As discussed above, Zoltek's most recent requests are not directed towards partially carbonized fibers, but to carbon fibers more generally. Zoltek also admits that it is seeking information relevant to damages. Pl.'s Resp., Feb. 28,

2012, at 12–13 (Docket No. 445). Furthermore, Zoltek states that believes it is entitled to seek discovery regarding any Northrop program. It asserts that it never limited its complaint to the B–2, and the Court is unfairly restricting Zoltek to the B–2 program.

Zoltek has made this argument before. In April 2004, the Court found that Zoltek could not reasonably assert a claim against another program and that Zoltek could seek discovery beyond the B–2 program only if it showed that it reasonably believed it had a claim against another program or showed that its requests were relevant to the claim against the B–2 program. In its recent request for relief, Zoltek has neither presented evidence showing the existence of a claim against another program nor linked to the B–2 program the information it is requesting.

In the past, the Court has granted Zoltek considerable latitude in seeking discovery to ensure that Zoltek had a fair opportunity to vindicate its patent rights in light of the procedural difficulties Zoltek faced. Now, Zoltek has had that opportunity. In asking for additional discovery, neither the evidence nor Zoltek's arguments are new. After considering all of the evidence before it, the Court finds that Zoltek has not established that discovery should be enlarged. Accordingly, its request is denied.

## 2. Zoltek Has Not Shown that Northrop Failed to Produce Documents.

Zoltek also argues that Northrop should be held in contempt for failing to produce documents related to MS–419 and MS–419B in response to Zoltek's requests for documents relating to the purchase or use of partially carbonized fibers. Zoltek claims that Mr. Urig's deposition shows that MS–419 and MS–419B contain partially carbonized fibers. Zoltek therefore argues that Northrop's repeated statements that it did not have any documents relating to the purchase or use of "partially carbonized fibers and sheets/mats/coatings containing partially carbonized fibers for use on the B–2 Bomber" were false and that Northrop should be held in contempt for failing to produce documents. Pl.'s Resp., Feb. 28, 2012, at 9–10 (Docket No. 445). Zoltek also claims that it has other evidence showing that Northrop

purchased partially carbonized fibers that if incorporated into a sheet product would infringe its patent. Zoltek argues that the evidence, in combination with Mr. Urig's testimony, establishes that Northrop statements that it did not purchase any partially carbonized fibers (aside from the limited number of fibers that Northrop admits to have purchased for testing purposes) and that it has no documents relating to products containing such fibers were false.

Northrop argues that it has not violated any discovery orders. It states that it reasonably relied on the Court's April 13, 2004 Order that limited discovery to partially carbonized fiber products actually used on the B–2 Bomber and on the United States' position regarding the composition of the B–2. Northrop argues that it properly relied on Mr. Urig's analysis of the carbon fiber materials used in the B–2 in determining that it did not have any documents responsive to Zoltek's requests. Northrop's Reply, Mar. 12, 2012, at 6 (Docket No. 448). Northrop notes that the evidence Zoltek cites to is the testimony from 2001 and 2002 (Louise Hefner and Jozef Venner) and subsequent discovery has contradicted that testimony. Northrop's Mot. Quash, Feb. 21, 2012, at 6–7 (Docket No. 443).

The Government argues that nothing in Mr. Urig's deposition testimony indicated that MS–419 or MS–419B contained partially carbonized fibers so Zoltek's assertions regarding Northrop's statement is frivolous.

The Court sees nothing in Mr. Urig's testimony that supports Zoltek's contention that MS–419 and MS–419B contain partially carbonized fibers. Zoltek's contention in this regard is fanciful, at best. Nor is the Court persuaded by Zoltek's citation to the testimony of Ms. Hefner and Mr. Venner, which indicates that Northrop purchased some quantity of partially carbonized fibers from BASF. For many years, Zoltek has been citing to that same deposition testimony as evidence that Northrop is withholding information. Despite many years of discovery, Zoltek cannot point to any additional evidence to support that contention.

Zoltek is arguing that Northrop failed in 2004 to identify MS–419 and MS–419B as containing partially carbonized fibers. However, no evidence presented by Zoltek supports its position that those materials contain partially carbonized fibers. The upshot is that Zoltek's position essentially is that Northrop failed to identify MS–419 and MS–419B as products about which Zoltek would be interested in knowing more. That is not Northrop's responsibility. If Zoltek wanted documents about MS–419 and MS–419B, it should have requested documents about MS–419 and MS–419B.

The Court concludes that Zoltek has not established that Northrop failed to produce documents in response to the Court's April 13, 2004 Order.

## IV. CONCLUSION

Based on the foregoing discussion, the Court **GRANTS IN PART** and **DENIES IN PART** Northrop's Motion to Quash. Accordingly, all of the requests in Zoltek's subpoena are quashed, except for Request Numbers 11 and 14, as modified by the Court. Northrop has 30 days to respond to the two permissible requests.

The Court **DENIES** Zoltek's motion to enlarge discovery. Fact Discovery is closed. Expert discovery will close on September 1, 2012.